# THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

SELECTIVE INSURANCE COMPANY     :
        OF AMERICA,                    :
                                    :
            Plaintiff,               :
                                    :     **3:17-CV-2376**
                                    :     **(JUDGE MARIANI)**
ROBYN NOVITSKY, individually      :
and as Executrix of the Estate of    :
Kevin C. Novitsky, deceased,       :
VILLAGE AUTO SALES, INC., and     :
PATRICIA NOVITSKY, individually     :
and as the Executrix of the Estate    :
of Clement Novitsky, deceased,      :
                                    :
           Defendants.          :

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff filed this declaratory judgment action seeking a judicial determination of the amount of underinsured motorist coverage available to any Defendant in the action. (Doc. 1.) Four motions are pending before the Court: a motion for summary judgment filed by Defendants Robyn Novitsky and Village Auto Sales (Doc. 9); a motion for summary judgment filed by Defendant Patricia Novitsky (Doc. 44); and cross-motions for summary judgment (Docs. 17, 47) filed by Plaintiff in response to Defendants' filings. With their motions, Defendants request a declaration that the amount of underinsured motorist coverage under their policy with Selective Insurance Company of America at the time of the

accident which occurred on May 24, 2017, is $1,000,000 combined single limit. (Doc. 9 at 11; Doc. 44 at 10.) In the Complaint and cross-motions (Docs. 1, 17, 47), Plaintiff seeks a declaration that the available underinsured motorist coverage is $35,000. For the reasons discussed below, the Court concludes that Plaintiff's cross-motions are properly granted.

## II. STATEMENT OF UNDISPUTED FACTS[1]

In conjunction with the disposition of the pending motions, the Court issued a Memorandum and Order addressing Defendants' Robyn Novitsky, Individually and as Executrix of the Estate of Kevin C. Novitsky, Deceased, and Village Auto Sales, Inc.'s Motion to Strike Plaintiff's Responses to Defendants' Statement of Undisputed Facts and Deem Facts Admitted (Doc. 29). Defendants' motion was granted in part and denied in

---

[1] Because the statement of undisputed facts filed by Defendant Patricia Novitsky (Doc. 44-1) with limited exceptions mirrors the statement of undisputed facts filed by Defendants Robyn Novitsky and Village Auto Sales (Doc. 10), the Court will cite to the statement filed by Defendants Robyn Novitsky and Village Auto Sales (Doc. 10) noting differences as appropriate, and the Court will cite to Plaintiff's responses to same (Doc. 20). Similarly, because Plaintiff's statements of undisputed material facts (Docs. 21, 49) are basically the same, the Court will cite to that first filed (Doc. 21) and cite to the responsive statement filed by Defendants Robyn Novitsky and Village Auto Sales (Doc. 27), noting any relevant distinctions among the filings and/or providing additional citation.

Facts deemed undisputed include those for which improper responses were provided pursuant to Federal Rule of Civil Procedure 56(c) and/or Local Rule 56.1. Fed. R. Civ. P. 56(e); M.D. Pa. L.R. 56.1. *See infra* n. 2.

The parties provide citation to the record for all statements considered in this section of the Memorandum. (*See* Docs. 10, 20, 21, 27, 44-1, 49, 50, 54.) The Court has verified those citations but omits them from the recitation set out in the text.

2

part. (Docs. 55, 56.) The following recitation reflects the determinations set out in the previously filed Memorandum and Order.[2] (*Id.*)

Defendant Robyn Novitsky was the wife of Kevin Novitsky, deceased, who was killed in a car accident on May 24, 2017. (Doc. 10 ¶ 1; Doc. 20 ¶ 1.) Defendant Patricia Novitsky was the wife of Clement Novistsky who was killed in the same accident. (Doc. 44-1 ¶ 1; Doc. 50 ¶ 1.) Robyn Novitsky is the executrix of the Estate of Kevin Novitsky. (Doc. 10 ¶ 2; Doc. 20 ¶ 2.) Patricia Novitsky is the executrix of the Estate of Clement Novitsky. (Doc. 44-1 ¶ 2; Doc. 50 ¶ 2.)

On May 17, 2017, decedents Clement and Kevin Novitsky (father and son) purchased a vehicle on behalf of their business, Village Auto Sales, Inc., at the ABC Auction of Lancaster. (Doc. 10 ¶¶ 19-20; Doc. 20 ¶¶ 19-20.) After they purchased the vehicle, a 2008 Nissan Rogue, the dealer tags/license plates for Village Auto Sales, Inc., were placed

---

[2] The motion was granted in that the following paragraphs in Defendants' L.R. 56.1 statement (Doc. 10) were deemed admitted: ¶¶ 15, 51, 55, 57, 58, 60, 61, 63, 64, 76, 77. The motion was denied in that the following paragraphs were deemed disputed or otherwise excluded from consideration in the Court's recitation of undisputed material facts when considering the pending summary judgment motions: ¶¶ 16, 17, 18, 36, 56, 71, 74, 75, 78, 79, 80. The Court noted that nothing in the disposition of the motion should be read to indicate that all statements of fact deemed admitted therein and in the parties' statements of facts will be included in the Court's recitation when considering the pending summary judgment motions and cross-motions as some facts may be found to be immaterial, repetitious, or otherwise not supported by the record. (Doc. 55 at 8 n.1 (citing *Dawn L. v. Greater Johnstown Sch. Dist.*, 614 F. Supp. 2d 555, 558 (W.D. Pa. 2008)).)

on it for transport back to Village Auto Sales, Inc., in Scott Township, Pennsylvania. (Doc. 10 ¶ 22; Doc. 40 ¶ 22.)

While traveling north on Interstate 81 in the 2008 Nissan Rogue, driver Kevin Novitsky stopped the car behind several stopped vehicles ahead of him when the car was hit from behind by a tractor-trailer driven by Brian Barrett and owned by Jason J. Barry. (Doc. 10 ¶ 24; Doc. 20 ¶ 24.) The Nissan Rogue was pushed forward into the car in front of it and both the tractor trailer and Nissan Rogue became engulfed in flames. (*Id.*) Both Clement and Kevin Novitsky were trapped in the Nissan Rogue and burned alive. (Doc. 10 ¶ 25; Doc. 20 ¶ 25.)

The tractor trailer operated by Brian Barrett and owned by Jason J. Barry ("the Tortfeasors") maintained a combined single limit policy of $1,000,000 with Nationwide E & S ("the Tortfeasors' Policy"). (Doc. 10 ¶ 26; Doc. 20 ¶ 26.) The $1,000,000 was distributed among a number of claimants including Kevin and Clement Novitsky. (Doc. 10 ¶ 27; Doc. 20 ¶ 27.) Kevin Novitsky received $493,485.50. (Doc. 10 ¶ 28; Doc. 20 ¶ 28.) Clement Novitsky received $296,091.30. (Doc. 44-1 ¶ 28; Doc. 50 ¶ 28.)

As of the date of the accident, May 24, 2017, Village Auto Sales, Inc., had a policy of insurance with Plaintiff, Selective Insurance Company of America, with effective dates July 13, 2016, through July 13, 2017, and policy number S1276407. (Doc. 10 ¶¶ 29, 30; Doc. 20 ¶¶ 29, 30.) The "Garage Coverage Declaration" for the policy indicates the "Covered Auto Symbol" for "Underinsured Motorists" Coverage is 22. (Doc. 10 ¶ 32; Doc. 20 ¶ 32.) The

4

2008 Nissan Rogue was a "covered auto" under the operative policy for purposes of underinsured motorist coverage. (Doc. 10 ¶ 35; Doc. 20 ¶ 35.)

Defendants made an underinsured motorist ("UIM") claim with Plaintiff based on the value of the wrongful death and survival claims. (Doc. 10 ¶ 37; Doc. 20 ¶ 37.) Under the terms of the policy, Decedent Kevin Novitsky was an "insured" under the policy as was Decedent Clement Novitsky. (Doc. 10 ¶ 39; Doc. 20 ¶ 39; Doc. 44-1 ¶ 39; Doc. 50 ¶ 39.) Robyn Novitsky is an "insured" for purposes of the policy, as is Patricia Novitsky. (Doc. 10 ¶ 40; Doc. 20 ¶ 40; Doc. 44-1 ¶ 40; Doc. 50 ¶ 40.)

## PRIOR VILLAGE AUTO SALES POLICIES

As of July 13, 1999, Village Auto Sales, Inc., had a Commercial Automobile Policy with Selective Insurance Company of South Carolina. (Doc. 10 ¶ 41; Doc. 20 ¶ 41.) Village Auto Sales, Inc., remained insured with Selective Insurance Company of South Carolina through and including July 13, 2012. (Doc. 10 ¶¶ 41-42; Doc. 20 ¶¶ 41-42.) The effective dates of the policy, number S1276407, were July 13, 2011, through July 13, 2012. (Doc. 10 ¶ 43; Doc. 20 ¶ 43.)

On or about July 24, 2012, Plaintiff, Selective Insurance Company of America, issued a "Notice of Policy Transfer Into New Selective Affiliate" ("Notice") to Village Auto Sales, Inc., under a form identified as IN 03 56 11. (Doc. 10 ¶ 45; Doc. 20 ¶ 45.) The Notice contains the following statement:

Policy Number: S 1276407

5

Old Selective Affiliate: SELECTIVE INSURANCE COMPANY OF SOUTH
CAROLINA

Old Policy Expiration Date: July 13, 2012, AT12:01 AM STANDARD TIME

New Selective Affiliate: SELECTIVE INSURANCE COMPANY OF AMERICA

New Policy Effective Date: July 13, 2012 AT 12:01 AM STANDARD TIME.

(Doc. 10 ¶ 47; Doc. 20 ¶ 47.)   The Notice also states the following:

> This realignment will result in your coverage being reissued through the new
> Selective affiliate.  You'll see this name on your renewal notice, insurance ID
> cards and billing notices. . . . At the expiration of your current insurance policy,
> your insurance will be rewritten and offered to you by the new Selective affiliate.
> Your old policy will end and your new policy will begin without any break in
> coverage. . . .
>
> . . . .
>
> Upon receipt of your policy if you are satisfied with the premium and the
> movement of your coverage to the new Selective affiliate, simply pay your
> premium as you normally would.

(Doc. 10 ¶¶ 48-50; Doc. 20 ¶¶ 48-50.[3])

Pursuant to the Notice, effective July 13, 2012, at 12:01 a.m., Village Auto Sales,

Inc., was no longer an insured of Selective Insurance Company of South Carolina.  (Doc. 10

¶ 51; Doc. 20 ¶ 51.)  Pursuant to the Notice, effective July 13, 2012, at 12:01 a.m., Village

Auto Sales, Inc., became an insured of Plaintiff, Selective Insurance Company of America.

---

[3] Though the parties did not do so, the Court presents the statements agreed upon in the context of the
Notice provided. (See, e.g., Doc. 19-5 at 2-3.)

(Doc. 10 ¶ 52; Doc. 20 ¶ 52.) Pursuant to the Notice, Village Auto Sales, Inc.'s, policy with Selective Insurance Company of South Carolina expired on July 13, 2012, at 12:01 a.m. (Doc. 10 ¶ 53; Doc. 20 ¶ 53.) Pursuant to the Notice, Village Auto Sales, Inc.'s, policy with Plaintiff, Selective Insurance Company of America, became effective on July 13, 2012, at 12:01 a.m. (Doc. 10 ¶ 54; Doc. 20 ¶ 54.) Pursuant to the Notice, Village Auto Sales, Inc.'s, policy was rewritten through Plaintiff, Selective Insurance Company of America, as of July 13, 2012. (Doc. 10 ¶ 55; Doc. 20 ¶ 55.) Pursuant to the Notice, as of July 13, 2012, at 12:01 a.m., Plaintiff Selective Insurance Company of America, delivered a policy of insurance to Village Auto Sales, Inc. (Doc. 10 ¶ 58; Doc. 20 ¶ 58.)

By virtue of the payment of premiums for the policy which became effective on July 13, 2012, at 12:01 a.m., Village Auto Sales, Inc., accepted the policy of insurance offered by Plaintiff. (Doc. 10 ¶ 59; Doc. 20 ¶ 59.) Plaintiff, Selective Insurance Company of America, did not insure Village Auto Sales, Inc., prior to the policy which began as of July 13, 2012, at 12:01 a.m. (Doc. 10 ¶ 62; Doc. 20 ¶ 62.)

Plaintiff, Selective Insurance Company of America, is a corporation organized and existing under the laws of New Jersey with the number assigned by the National Association of Insurance Commissioners ("NAIC") of 12572. (Doc. 10 ¶¶ 4, 6; Doc. 20 ¶¶ 4, 6.) Selective Insurance Company of South Carolina is a corporation organized and existing under the laws of Indiana with the assigned NAIC number of 19259. (Doc. 10 ¶¶ 5, 7; Doc. 20 ¶¶ 5-7.) Selective Insurance Company of America and Selective Insurance Company of

South Carolina have separate tax identification numbers and different agents for service of process. (Doc. 10 ¶¶ 12-14; Doc. 20 ¶¶ 12-14.) Selective Insurance Company of America and Selective Insurance Company of South Carolina are separate corporations. (Doc. 10 ¶ 15; Doc. 20 ¶ 15.) Selective Insurance Company of America is a wholly-owned subsidiary of the Selective Insurance Group, Inc.. (Doc. 21 ¶ 3; Doc. 27 ¶ 3.) Selective Insurance Group of South Carolina is a wholly-owned subsidiary of the Selective Insurance Group, Inc. (Doc. 21 ¶ 4; Doc. 27 ¶ 4.)

**UNDERINSURED MOTORIST COVERAGE**

On or about July 30, 2001, Robyn Novitsky signed a Commercial Automobile Pennsylvania Coverage Selection Form as a duly authorized representative of Village Auto Sales, Inc. (Doc. 21 ¶¶ 20-21; Doc. 27 ¶¶ 20-21.)

Though not contained in the parties' statements of facts, the parties do not dispute that the Commercial Automobile Pennsylvania Coverage Selection Form signed by Robyn Novitsky indicates that she elected to choose lower uninsured and underinsured motorist benefit levels than those outlined in the "Important Notice." (*See* Doc. 19-4 at 2-4.) Specifically, having chosen $1,000,000 in Liability Insurance Coverage, she chose $35,000 Uninsured Motorists Coverage and $35,000 Underinsured Motorists Coverage. (*Id.* at 3-4)

The policy of insurance issued by Selective Insurance Company of South Carolina to Village Auto Sales, Inc., had UM/UIM coverage and limits of $35,000 combined single limit per accident. (Doc. 21 ¶ 19; Doc. 27 ¶ 19.)

8

The 2012-2013 Selective Insurance Company of America Policy, under the "Garage Coverage Declaration" lists coverages for "Garage Operations Liability" of $1,000,000 each accident for "auto." (Doc. 10 ¶ 66; Doc. 20 ¶ 66.) The "Garage Coverage Declaration" for the 2012-2013 Selective Insurance Company of America Policy lists coverages for "Underinsured Motorists" of "$35,000 CSL" which means combined single limit. (Doc. 10 ¶ 68; Doc. 20 ¶ 68.)

From July 13, 2012, at 12:01 a.m. through and including May 24, 2017, Village Auto Sales, Inc., was insured under a policy of insurance with Plaintiff, Selective Insurance Company of America, which included both commercial property coverage and commercial garage coverage. (Doc. 10 ¶ 72; Doc. 20 ¶ 72.) The "Garage Coverage Declaration" for the 2016-2017 Selective Insurance Company of America Policy which was in effect at the time of the May 24, 2017, accident, lists coverages for "Garage Operations Liability" of $1,000,000 each accident for "auto" and "Underinsured Motorists" of "$35,000 CSL." (Doc. 10 ¶ 73; Doc. 20 ¶ 73.)

By email dated June 29, 2017, Defendants' counsel requested that Plaintiff, Selective Insurance Company of America, provide written confirmation of available UIM coverage with respect to the May 24, 2017, accident. (Doc. 10 ¶ 81; Doc. 20 ¶ 81.) By email response dated August 28, 2017, Plaintiff advised that its position was that there was "$35,000.00 CSL for UI/UIM coverage." (Doc. 10 ¶ 82; Doc. 20 ¶ 82.) By letter dated November 16, 2017, Plaintiff provided written consent to settle with the tortfeasors and their

9

insurer and waived subrogation rights for the injury and property damage claims involved. (Doc. 10 ¶ 83; Doc. 20 ¶ 83.)

By correspondence dated December 12, 2017, Defendants, through counsel, advised that pursuant to Sections 1731(c)(1) and 1734 of the Motor Vehicle Financial Responsibility Law, a request for lower limits of underinsured motorist coverage must be in writing; that Plaintiff had failed to produce any forms that reduced the underinsured motorist limits prior to the May 24, 2017, crash; and therefore the underinsured limits under the 2016-2017 Selective Insurance Company of America Policy are equal to the liability limits of $1,000,000.00. (Doc. 10 ¶ 84; Doc. 20 ¶ 84.[4])

## III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

---

[4] Plaintiff does not dispute the fact of the correspondence but disputes the legal conclusions contained therein. (Doc. 20 ¶ 84.)

S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-

moving party must offer specific facts contradicting those averred by the movant to establish

a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct.

3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary

judgment simply on the basis of the pleadings, or on conclusory statements that a factual

issue exists. *Anderson,* 477 U.S. at 248. "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion by citing to particular parts of materials in the

record . . . or showing that the materials cited do not establish the absence or presence of a

genuine dispute, or that an adverse party cannot produce admissible evidence to support

the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should

be granted, "[t]he court need consider only the cited materials, but it may consider other

materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light

most favorable to the non-moving party, and where the non-moving party's evidence

contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW,*

*Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912,

113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 380, 127

S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary

judgment rule,

its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, summary judgment is not appropriate.

In a case where no facts are contested and what lies before the court are entirely legal questions, summary judgment on all contested issues is appropriate. *Methode Electronics, Inc. v. Elco Corp.,* 385 F.2d 138, 139 (3d Cir.1967) (summary judgment "is appropriate when ... only legal questions are to be resolved"). Under Pennsylvania law, it is well-established that the interpretation of an insurance policy is a matter of law that may be properly resolved at summary judgment. *Nationwide Mut. Ins. Co. v. Nixon,* 453 Pa. Super. Ct. 70, 682 A.2d 1310, 1313 (1996).

12

The standard for granting summary judgment in a declaratory judgment action is the same as for any other type of relief. *Cloverland-Green Spring Dairies, Inc. v. Pa. Milk Marketing Board*, 298 F.3d 201, 210 n.12 (3d Cir. 2002). The standard is also the same when cross motions are filed in a declaratory judgment action. *See Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). *Lawrence* noted that "cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Id.* (internal quotation omitted). A district court "should consider cross-motions for summary judgment separately and apply the burden of production to each motion." *Beenick v. LeFebvre*, 684 F. App'x 200, 205 (3d Cir. 2017) (not precedential) (citing *Lawrence*, 527 F.3d at 310). "If upon review of cross motions for summary judgment [the court] find[s] no genuine dispute over material facts, then [the court] will order judgment to be entered in favor of the party deserving judgment in light of the law and undisputed facts." *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998) (citing *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145-46 (3rd Cir.1998)).

## IV. ANALYSIS

Plaintiff filed this declaratory judgment action pursuant to 28 U.S.C. §§ 2201 and 2202 requesting that Declaratory Judgment be entered declaring that, pursuant to 75 Pa.

13

C.S.A. §§ 1731 and 1734, the amount of underinsured motorist coverage under the 2016-2017 Selective Insurance Company of America Policy in effect at the time of the May 24, 2017, crash is $35,000 combined single limit. (Doc. 1 at 3, 9.) Defendants filed their summary judgment motions asking the Court to enter summary judgment in their favor declaring that, pursuant to 75 Pa. C.S.A. §§ 1731 and 1734, the amount of underinsured motorist coverage at the time of the May 2017 crash is $1,000,000 combined single limit based on the failure of Plaintiff to produce a written request for lower underinsured coverage by the named insured, Village Auto Sales, Inc., that pre-dates the May 2017 crash. (Doc. 9 at 11; Doc. 44 at 10-11.) In the cross-motions, Plaintiff moves the Court for summary judgment on its declaratory judgment claim. (Doc. 17 at 1; Doc. 47 at 1.) [5]

Under the Declaratory Judgment Act "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). The United States Supreme Court has declared that "[d]istrict courts possess discretion in

---

[5] In the pending motions for summary judgment, Defendant Patricia Novitsky raises the same issues and makes the same arguments as Defendants Robyn Novitsky and Village Auto Sales, Inc. (See, e.g., Docs. 9, 10, 44, 46.) Similarly, Plaintiff's cross-motion and response regarding Defendant Patricia Novitsky's motion mirror those filed regarding the motion of Defendants' Robyn Novitsky and Village Auto Sales, Inc. (See, e.g., Docs. 17, 18, 47, 48.) In this scenario, the Court will cite to documents related to the motion of Defendants Robyn Novitsky and Village Auto Sales, Inc. and Plaintiff's cross-motion to same going forward in the Analysis portion of the Memorandum.

14

determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995). The Third Circuit Court of Appeals extensively considered the matter of a district court's discretion in *Reifer v. Westport Ins. Corp.*, 751 F.3d 129 (3d Cir. 2014). *Reifer's* guidance included situations relevant to this Court's jurisdictional determination, i.e., where the declaratory judgment action was brought in the context of an insurance dispute and where no parallel state court action was pending. *Id.* at 143-47. Having considered relevant factors--predominantly "the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy," and "the convenience of the parties," *id.* at 146--the Court will exercise its discretion and retain jurisdiction of the current action.

At issue in this case is whether the written reduction of UM/UIM benefits made on the 75 Pa. C.S.A. §§ 1791 and 1734 forms titled "Commercial Automobile Pennsylvania Coverage Selection Form IMPORTANT NOTICE" and "Commercial Automobile Pennsylvania Coverage Selection Form" dated July 30, 2001, at which time Village Auto Sales, Inc., was insured by a Selective Insurance Company of South Carolina policy, are applicable to the Selective Insurance Company of America policy in effect at the time of the accident. (Doc. 11 at 10; Doc. 18 at 8; *see also* Doc. 12-17 at 1, 2; Doc. 19-4 at 2, 3.) As to this dispositive question, key facts are not disputed: the parties do not dispute that the July 30, 2001, Selection Form was the only selection form signed by the insured; the parties

15

do not dispute that the July 30, 2001, Selection Form effectively and appropriately limited underinsured motorist coverage to $35,000 combined single limit accident coverage under the Selective Insurance Company of South Carolina policy; the parties do not dispute that the Selection Form applied to all Selective Insurance Company of South Carolina policy renewals; the parties do not dispute that, other than the change in the named insurer, the policies remained the same; and the parties do not identify other aspects/provisions of the relevant policies as material facts at issue. Rather, the parties' dispute hinges on the relationship, or lack thereof, between Selective Insurance Company of South Carolina and Selective Insurance Company of America and how Pennsylvania's legislative scheme governing UM/UIM coverage, as interpreted by Pennsylvania courts, applies to this case.

In applying Pennsylvania substantive law in this diversity action, the Court looks first to decisions of the Supreme Court of Pennsylvania and, if there is not a reported decision by a Pennsylvania court addressing the precise issue being considered, it is the Court's duty to predict how the Pennsylvania Supreme Court would interpret the relevant provisions of the Pennsylvania Motor Vehicle Financial Responsibility Law ("MVFRL"), 75 Pa. C.S.A. §§ 1701-1799.7, if presented with this case. See Nationwide Mut. Ins. Co. v. Buffetta, 230 F.3d 634, 637 (3d Cir. 2000).

> In so doing, a federal court can also give due regard, but not conclusive effect, to the decisional law of lower state courts. See, e.g., Burke v. Maassen, 904 F.2d 178, 182 (3d Cir.1990). The opinions of intermediate appellate state courts are "not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide

16

otherwise." *West v. AT & T Co.,* 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940).

*Buffetta,* 230 F.3d at 637.

The Pennsylvania Supreme Court discussed the policies underlying the MVFRL in *Lewis v. Erie Ins. Exchange,* 793 A.2d 143 (Pa. 2002). The court explained that the Pennsylvania General Assembly, in enacting the MVFRL, was concerned with containment of rising insurance costs. *Lewis,* 793 A.2d at 151. The court found the requirements under the MVFRL for UIM coverage serve to promote recovery for accident victims in the event negligent motorists are not adequately insured. *Id.* *Lewis* summarized that review of sections 1731 and 1734

> is informed by their integration into a scheme for motorist insurance which has been adjusted to preserve the availability of core remedial aspects while also promoting, with increasingly greater emphasis, the containment of insurance costs. With this background, we consider the statutory terms as written, as they relate to each other, and in their context within the surrounding framework.

793 A.2d at 152. Pennsylvania courts have directed that the MVFRL should be construed liberally to provide the greatest coverage to the injured claimants. *Motorists Ins. Co. v. Emig,* 664 A.2d 559, 566 (Pa. Super. Ct. 1995) (citations omitted). *Emig* added that "[i]n close or doubtful cases, we must intrerpret the intent of the legislature and the language of the insurance policies to favor coverage for the insured." *Id.* (citations omitted).

Here the parties do not point to Pennsylvania Supreme Court decisions directly on point but, rather, as discussed below, rely primarily on Pennsylvania Superior Court

opinions in support of their respective positions. Central to their arguments and the Court's analysis are several provisions of the MVFRL, specifically 75 Pa. C.S.A. §§ 1731, 1734, and 1791.

Turning first to the relevant MVFRL provisions, Pa. C.S.A. § 1731 addresses the "[a]vailabilitly, scope and amount of coverage" and provides in pertinent part:

> **(a) Mandatory offering**.--No motor vehicle liability insurance policy shall be delivered or issued for delivery in this Commonwealth, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverages are offered therein or supplemental thereto in amounts as provided in section 1734 (relating to request for lower limits of coverage). Purchase of uninsured motorist and underinsured motorist coverages is optional.

75 Pa. C.S.A. § 1731(a).

Section 1734 addresses the "[r]equest for lower limits of coverage" and states in total that "[a] named insured may request in writing the issuance of coverages under section 1731 (relating to availability, scope and amount of coverage) in amounts equal to or less than the limits of liability for bodily injury." 75 Pa. C.S.A. § 1734.

Section 1791 addresses the "[n]otice of available benefits and limits":

> It shall be presumed that the insured has been advised of the benefits and limits available under this chapter provided the following notice in bold print of at least ten-point type is given to the applicant at the time of application for original coverage, and no other notice or rejection shall be required:

> IMPORTANT NOTICE

> Insurance companies operating in the Commonwealth of Pennsylvania are required by law to make available for purchase the following benefits for

18

you, your spouse or other relatives or minors in your custody or in the custody of your relatives, residing in your household, occupants of your motor vehicle or persons struck by your motor vehicle:

(1) Medical benefits, up to at least $100,000.

(1.1) Extraordinary medical benefits, from $100,000 to $1,100,000 which may be offered in increments of $100,000.

(2) Income loss benefits, up to at least $2,500 per month up to a maximum benefit of at least $50,000.

(3) Accidental death benefits, up to at least $25,000.

(4) Funeral benefits, $2,500.

(5) As an alternative to paragraphs (1), (2), (3) and (4), a combination benefit, up to at least $177,500 of benefits in the aggregate or benefits payable up to three years from the date of the accident, whichever occurs first, subject to a limit on accidental death benefit of up to $25,000 and a limit on funeral benefit of $2,500, provided that nothing contained in this subsection shall be construed to limit, reduce, modify or change the provisions of section 1715(d) (relating to availability of adequate limits).

(6) Uninsured, underinsured and bodily injury liability coverage up to at least $100,000 because of injury to one person in any one accident and up to at least $300,000 because of injury to two or more persons in any one accident or, at the option of the insurer, up to at least $300,000 in a single limit for these coverages, except for policies issued under the Assigned Risk Plan. Also, at least $5,000 for damage to property of others in any one accident.

Additionally, insurers may offer higher benefit levels than those enumerated above as well as additional benefits. However, an insured may elect to purchase lower benefit levels than those enumerated above.

Your signature on this notice or your payment of any renewal premium evidences your actual knowledge and understanding of the availability of these benefits and limits as well as the benefits and limits you have selected.

If you have any questions or you do not understand all of the various options available to you, contact your agent or company.

If you do not understand any of the provisions contained in this notice, contact your agent or company before you sign.

75 Pa. C.S.A. § 1791.

In this scheme, "insurers must offer UM/UIM coverage in amounts equal to the bodily

injury liability coverage except where the named insured requests in writing coverage in

amounts less than the limits of liability for bodily injury." *Breuninger v. Pennland Insurance*

*Company*, 675 A.2d 353 (Pa. Super Ct. 1996) (citing Pa. C.S.A. §§ 1731, 1733, 1734).

*Breuninger* further explained that

> [i]n addition, Section 1791 of the MVFRL requires an insurer to furnish the policy applicant with an "Important Notice." This notice must advise the applicant of the types and amounts of coverages which are required to be offered to her. *Motorists Ins. Co. v. Emig*, 444 Pa.Super. 524, 664 A.2d 559 (1995). This notice must also inform the applicant that she may purchase or reject these coverages. *Id.* The applicant must also be made aware that she may purchase coverages in higher or lower amounts than those set forth in the "Important Notice." *Id.* Section 1791 provides the method of apprising an insured of the benefits and limits available pursuant to the statute.
>
> . . . .
>
> . . . .
>
> We have held that if the insurer strictly follows Section 1791, there is a conclusive presumption that the insured has actual knowledge of the coverage available to her under the MVFRL. *Tukovits* [*v. Prudential Ins. Co.*, 672 A.2d 786 (Pa. Super. Ct. 1996)]; *Lambert v. McClure*, 407 Pa.Super. 257, 595 A.2d 629 (1991).

20

675 A.2d at 356. In *Emig*, the Superior Court considered the relationship between the

conclusive presumption of § 1791 and UM/UIM coverage reductions under § 1734. 664

A.2d at 569.

> The "Important Notice" is merely a notice to appellee that she must be offered
> certain benefits in certain amounts which she may accept, reject or reduce.
> Thus, Section 1791 does not provide the means for selection, rejection or
> reduction of these offered benefits. This, instead, is provided for by the
> legislature in Subchapter "C". The "Important Notice" merely informs appellee
> that she is presumed to know and understand those benefits offered *and* those
> benefits which she has selected in conformity with law, *i.e.,* in this case, Section
> 1734.

*Emig*, 664 A.2d at 569. Thus, the court held that, for the § 1791 conclusive presumption to

be effective regarding UM/UIM coverage, "an insured must have actually selected

coverage[s], and the selection process must first be in conformity with the law, i.e., in this

case, with Section 1734." *Id.*

Looking now for specific guidance on the issue presented here-- the effect of a policy

change from one insurer to another on an insured's underinsured motorist benefits--two

Superior Court cases are instructive: *Weilacher v. State Farm Mut. Auto. Ins. Co.*, 65 A.3d

976, 983 (Pa. Super. Ct. 2013), and *Breuninger,* 675 A.2d 353.

In *Weilacher*, the plaintiffs sought UIM coverage equal to the bodily injury coverage

although the policy in place at the time of the accident for which they sought benefits had a

$500,000 bodily injury limit and a $25,000/$50,000 UIM coverage limit. 65 A.3d 976. After

the trial court granted summary judgment for the insurance company limiting UIM coverage

21

to that identified in the policy, the plaintiffs appealed. *Id.* The Superior Court summarized

relevant facts as follows:

> in 1994, the Weilachers had an automobile policy with State Farm Fire and
> Casualty Company that had bodily injury liability coverage in the amount of
> $25,000/$50,000. The Weilachers signed an "Important Notice," and also
> rejected UIM coverage in this initial policy. In August 1999, Melissa [Weilacher]
> signed another "Important Notice" and expressly selected UM coverage with
> limits of $25,000/$50,000, which matched the bodily injury liability coverage. In
> September 1999, the Weilachers' policy was transferred from State Farm Fire
> and Casualty Company to State Farm [Mutual Automobile Insurance Company
> ("State Farm")]. Thereafter, in February 2000, State Farm added UIM coverage
> with limits of coverage of $25,000/$50,000, which matched the bodily injury
> liability coverage, to the Weilachers' policy. The Weilachers did not select this
> coverage or receive any acknowledgment of this transaction; however, in
> February 2002, Melissa signed an "Important Notice." In January 2009, the
> Weilachers increased their bodily injury liability limit to $500,000. The
> Weilachers did not sign any acknowledgement for UM/UIM coverage, did not
> request UM/UIM coverage limits of $25,000/$50,000, and did not request a
> reduction of the statutorily provided UIM limits.

65 A.3d at 985–86. Although the trial court found, relying on *Blood v. Old Guard Ins. Co.*,

934 A.2d 1218 (Pa. 2007), that there was no specific language under §§ 1731 and 1734

that required an insured to complete a written request for lower limits for UM/UIM coverage

when the limits for bodily injury are increased, *id.* at 981-82, the Superior Court disagreed,

concurring with the plaintiffs that § 1734 was triggered when State Farm unilaterally set the

UIM coverage in 2000 at $25,000/$50,000 to match the bodily injury liability coverage, *id.* at

984. Noting that *Blood* held that the plaintiff's "initial application indicating reduced UM/UIM

coverage, which had never been changed, satisfied section 1734's writing requirement and

remained in effect after a reduction in bodily injury coverage," *id.* at 985 (citing *Blood*, 934

22

A.2d at 1227), the Superior Court distinguished the addition of UM/UIM coverage after the

initial rejection of coverage. *Weilacher* then concluded that

> if an insured purchases new UM/UIM coverage following an initial rejection of
> UM/UIM coverage, the insurer must provide UM/UIM coverage equal to the
> bodily injury liability coverage, unless the insured validly requests lower limits
> of coverage pursuant to section 1734. *See id.; see also Blood,* 934 A.2d at
> 1223. As noted above, after the Weilachers purchased UM coverage with limits
> of $25,000/$50,000 in 1999, State Farm unilaterally and voluntarily provided
> UIM coverage in the same amount to the Weilachers in 2000, ostensibly in
> compliance with section 1731. *See Smith,* 849 A.2d at 280 (stating that the
> purchase of an insurance policy is not a lifetime contract and that amounts of
> coverage change). Further, the Weilachers paid a higher premium after the
> addition of the UM/UIM coverage. Thus, because the Weilachers affirmatively
> added the UM/UIM coverage following their rejection of UM/UIM coverage,
> State Farm could only supply lower UM/UIM coverage if the Weilachers signed
> a section 1734 written request. *See id.* at 281. However, at no time after the
> UM/UIM coverage was added to the policy, and the bodily injury limits were
> increased to $500,000, did the Weilachers provide any written request seeking
> to lower the UM/UIM coverage levels pursuant to section 1734. Therefore, the
> reasoning of *Blood,* where there was a valid request for lower UM/UIM
> coverage limits pursuant to section 1734 that continued to be binding even after
> Blood decreased his liability limits, is not applicable to this case. Accordingly,
> because the Weilachers never signed a written request for lower UM/UIM
> coverage limits pursuant to section 1734, the UIM coverage limit must be equal
> to the bodily injury limit of $500,000. *See* [*Erie Ins. Exchange v. Larrimore,* 987
> A.2d 732, 743 (Pa. Super. Ct. 2009).]

65 A.3d at 986–87. *Weilacher* also confirmed that where plaintiffs paid lower premiums for

years after the policy change at issue, "[i]t is well-settled that 'the insured's payment of

[their] premiums for several years thereafter cannot operate as a waiver under Sections

1734 and 1791.'" 65 A.3d at 987 (quoting *Larrimore,* 987 A.2d at 742; citing *Emig,* 664 A.2d

at 565 n.1).

In *Breuninger*, the plaintiff was insured by Harleysville Mutual Insurance Company ("Harleysville") in 1984 when the policy became subject to the MVFRL. 675 A.2d at 355. At the time, Harleysville sent the insured the "Important Notice" ("Notice") required by § 1791 of the MVFRL. *Id.* The parties did not dispute the following facts: the insured wrote on the 1984 Notice that she wanted $35,000 in UM/UIM coverage but she neither signed nor returned it to Harleysville; in September 1984, the insured received a renewal declarations page with liability limits of $50,000 and $35,000 in UM/UIM coverage; in 1987, Harleysville, at the insured's request, issued a renewal declaration increasing the insured's liability coverage to $100,000 but leaving the UM/UIM coverage at $35,000; in July 1990, Harleysville sent another coverage selection form to the insured which again advised her of her options under the MVFRL; the insured indicated on the form that she wanted $100,000 for liability coverage and $35,000 for UM/UIM coverage; the insured signed the form and returned it to Harleysville. 675 A.2d at 355. In 1991, Harleysville transferred the insured's policy to Pennland, a wholly owned subsidiary of Harleysville, under the same policy number. *Id.* Pennland did not send the insured an "Important Notice" form or any other coverage selection form. *Id.* Pennland did send the insured a form titled "Renewal Notice" whereby she was informed that her coverage was to remain the same. *Id.* Following an accident in 1993 where the insured made a demand to Pennland for UIM coverage benefits of $100,000 even though the policy under which she was covered provided for only $35,000 UIM benefits, Pennland paid $35,000 but refused to pay her the remaining $65,000. *Id.* at

24

356. The insured filed an action for declaratory judgment, the parties cross-filed motions for

summary judgment, and the lower court granted Pennland's motion after hearing oral

argument. *Id.*

On appeal, the Superior Court affirmed the lower court after noting that "the only

issue to be resolved by the lower court was 'whether the insured knowingly and voluntarily

selected $35,000 in UM/UIM coverage as a matter of law.'" *Id.* The court summarized the

parties' arguments as follows:

> The insured argues that she did not knowingly and voluntarily elect the
> $35,000.00 UM/UIM limit as is mandated by MVFRL. In the absence of a valid
> election of UM/UIM limits, she argues that the MVFRL mandates that the
> UM/UIM limit be equal to the bodily injury limit of $100,000.00. The insured
> further argues that her election was not voluntary because Pennland never
> provided her with an "Important Notice" form. Pennland admits that it never
> provided the insured with an "Important Notice" form, but argues that it was not
> required to do so because of its relationship with Harleysville. Pennland paid
> the insured $35,000.00, but refused to pay her the remaining $65,000.00 which
> she claimed.

*Breuninger*, 675 A.2d at 355–56. The Superior Court first determined that the insured had

knowingly and voluntarily selected $35,000 UM/UIM coverage based on her receipt in 1990

of the "Important Notice" and her completion of the coverage selection form on which she

indicated that she wanted to continue with the $35,000 UM/UIM coverage. *Id.* at 357. The

court then addressed the insured's argument that "when her automobile insurance policy

was transferred from Harleysville to Pennland, the latter was required to meet the

requirements under Section 1791 of the MVFRL and that it could not simply 'stand in the

25

shoes' of Harleysville for this purpose." *Id.* at 358. Noting this to be an issue of first

impression in the Commonwealth, *Breuninger* considered the following record evidence:

> on April 3, 1991, Harleysville transferred the insured's policy to its wholly owned subsidiary, Pennland. It is undisputed that Pennland sent the insured a form entitled "Renewal Notice," whereby she was informed that her policy number remained in effect, that her coverage remained exactly the same and that her premium would not be changed. The insured's policy with Harleysville was not cancelled and, therefore, the insured was not required to apply for automobile insurance with Pennland. That is, the insured was never an "applicant" for automobile insurance with Pennland. The only relevant difference between the insured's policy with Harleysville and her policy with Pennland was the name of the insurer. Moreover, the record reveals that the insured never objected to the transfer of her policy to Pennland and that she made her premium payments to Pennland.
>
> It is further undisputed that after the transfer of the insured's policy was completed, Pennland never sent the insured an "Important Notice" form nor any other coverage selection form.

675 A.2d at 358. The insured alleged that this was in violation of Section 1791 of the

MVFRL, and, therefore, it could not be shown that she knowingly and voluntarily selected

$35,000.00 in UM/UIM coverage. *Id.* The Superior Court disagreed, concluding that the

language of Section 1791 "is plain, unambiguous and conveys a clear and definite

meaning." *Id.* With this threshold determination, the court proceeded with the following

analysis:

> Clearly, as the express language of Section 1791 indicates, the MVFRL requires insurers to provide individuals with notice concerning the availability of UM/UIM coverage only at the time of "application for original coverage" or at the time of the "first renewal after October 1, 1984." Here, the statute does not define the meaning of "application for original coverage" or at the time of the "first renewal after October 1, 1984." Therefore, we shall construe the language

of Section 1791 according to its common, plain and everyday meaning. We note that Black's Law Dictionary defines "application" in the context of insurance as "[t]he preliminary request, declaration, or statement made by a party applying for an insurance policy...." Black's Law Dictionary 90 (5th ed. 1979).

The record is clear that the insured never applied for original coverage with Pennland. That is, she never made a preliminary request, declaration or statement in regard to the insurance policy at issue after it was transferred to Pennland. In fact, it would have been impossible for the insured to have done so because the policy held by Pennland was exactly the same policy held by Harleysville. It is undisputed that the insured's policy remained in effect and unchanged when it was transferred to Pennland. In addition, the record is clear that she was provided with notice as to the available UM/UIM coverage prior to her first renewal after October 1, 1984, when the policy at issue was held by Harleysville. Therefore, we find that based on the express language of Section 1791, the legislature did not intend for another "Important Notice" to be sent to the insured by Pennland in this situation. Accordingly, we reject the insured's argument that Pennland was required to provide her with an "Important Notice" form pursuant to Section 1791.

Considering all of the evidence in the light most favorable to the insured, we find that the evidence proved waiver as a matter of law in regard to her UM/UIM coverage. Accordingly, we find that the lower court did not abuse its discretion when it determined that the insured knowingly and voluntarily reduced her UM/UIM coverage in writing and granted summary judgment in favor of Pennland.

675 A.2d at 358–59.

In its Complaint for Declaratory Judgment (Doc. 1), Plaintiff cites *Breuninger* in support of the assertion that "[i]t is settled law in Pennsylvania that the transfer of motor vehicle insurance from one company to another affiliated company does not constitute a new policy" and further asserts that, pursuant to federal and state courts addressing the issue, new § 1734 sign down forms are not required to be obtained by the new affiliate

27

(Doc. 1 ¶ 41). As discussed below, Defendants disagree with this analysis, contending that here Selective Insurance Company of America was required to obtain new forms and, because they did not, Defendants are entitled to summary judgment in their favor.

## A. Defendants' Motions

With their summary judgment motions, Defendants maintain that, although the "Garage Coverage Declaration" for the 2016-2017 Selective Insurance Company of America ("Selective-America") policy in place at the time of the May 2017 accident lists coverage for "Underinsured Motorists" of "$35,000 CSL" (combined single limit), "it is undisputed that Selective-America never obtained a written reduction for UM/UIM benefits in an amount below the $1,000,000 liability limits as required by §§ 1731 and 1734." (Doc. 11 at 13-14.) In support of this assertion, Defendants argue that Plaintiff cannot rely on the 2001 written reduction between Village Auto Sales, Inc., ("Village Auto") and Selective Insurance Company of South Caroline ("Selective-South Carolina") because the two are separate companies, the Selective-America policy was a "new" policy that created a new contract between new parties requiring a new written reduction form under §§ 1731 and 1734, and the new written reduction was never obtained. (*Id.* at 14-15.)

Defendants first aver that general contract principles under Pennsylvania law indicate that, pursuant to the July 24, 2012, Notice "a new policy/contract was formed as soon as Village Auto paid premiums for the 2012-2013 Selective-America policy offered to it." (*Id.* at 21.) Defendants contend that the Notice meets the necessary elements of offer,

28

acceptance, and consideration: the new policy was being offered to Village Auto; and

Village Auto could accept the offer by paying premiums (acceptance and consideration).

(*Id.* (citing *Muhammad v. Strassburger*, 587 A.2d 1346, 1349 (Pa. 1991); *Herman v. Stern*,

213 A.2d 594, 601-02 (Pa. 1965)).) Defendants add that the conclusion is "mandated"

when the Notice is viewed in conjunction with §§ 1731 and 1734, pointing to the following:

> "No motor vehicle liability insurance policy shall be **delivered _or_ issued for delivery in this Commonwealth**, with respect to any motor vehicle registered or principally garaged in this Commonwealth, unless uninsured motorist and underinsured motorist coverages are offered therein or supplemental thereto in amounts as provided in section 1734 (relating to request for lower limits of coverage) .... 75 Pa. C.S. § 173[1] (emphasis added). Pennsylvania appellate courts have held, "Section 1731 **mandates** that an insurance company **issuing** a policy in the Commonwealth of Pennsylvania must provide UM/UIM coverage equal to the bodily injury liability coverage unless the insured validly rejects UM/UIM coverage or validly requests lower limits of coverage pursuant to section 1734." *Weilacher*, 65 A.3d at 983.

(Doc. 11 at 23.[6]) Defendants also find support for their argument in the Pennsylvania

Superior Court's pronouncement that "[t]he MVFRL is to be 'construed liberally' to 'afford[ ]

the injured claimant the greatest possible coverage. In close or doubtful cases, we must

interpret the intent of the legislature and the language of insurance policies to favor

---

[6] As demonstrated by the quoted material, Defendants employ liberal use of emphasis in their filings, including double and triple emphasis, and they do not consistently identify the origin of the emphasis as is seen in the *Weilacher* quotation where they fail to note "emphasis added" and *Weilacher* did not provide the emphasis noted, *see* 65 A.3d at 983. Therefore, hereinafter the Court will eliminate the emphasis found in material quoted from Defendants' briefs.

coverage for the insured.'" (*Id.* (quoting *Emig*, 664 A.2d at 566).) On the basis of

Pennsylvania contract principles and the MVFRL, Defendants conclude that

> [t]he July 2012 "Notice" made it clear that a "new" policy was being delivered to Village Auto by a "new" insurer and that the "new policy" was being "rewritten," "reissued" and "offered" to Village Auto by Selective-America. The common dictionary definition of "issue" is "The action of supplying or distributing an item for use, sale, or official purposes." en.oxforddictionaries.com/definition/issue accessed on 1/17/18. "Reissue" is defined as "Make a new supply or different form of (a product, especially a book or record) available for sale." *Id.* Selective-America also delivered the new policy to Village Auto and requested payment of premiums. . . . Thus, the new Selective-America policy was either "delivered or issued for delivery in this Commonwealth . . ." within the meaning of § 1731. Thus, in July 2012, when Selective-America unilaterally decided to terminate the prior policy between Village Auto and Selective-South Carolina, and "rewrite" and "reissue" and "offer" a "new" policy to Village Auto and/or deliver the new policy to Village Auto, §§ 1731 and 1734 and corresponding case law required a new UM/UIM reduction form.

(Doc. 11 at 23-24.)

The crux of Defendants' position is that § 1731 is triggered by the issuing of a policy

which is what happened here with the Selective-America policy. Under that section, the

UIM limits are equal to the bodily injury limits unless the insured sent a written request for

lower limits which did not happen here. Defendants cite no Pennsylvania or Third Circuit

cases applying the cited general contract principles to the MVFRL at issue here. Rather,

they rely primarily on *Weilacher* for its general pronouncements concerning §§ 1731 and

1734, focusing on the insurer's obligation to *issue* a policy with UIM coverage in an amount

equal to the bodily injury liability coverage. *See, e.g.,* Doc. 11 at 13 (citing *Weilacher,* 65 A.

3d at 983).) Based on the arguments presented and relevant Pennsylvania Superior Court authority, the Court cannot conclude that the Pennsylvania Supreme Court would adopt Defendants' position regarding the effect of a policy change from one wholly owned subsidiary affiliate to another in the circumstances presented here.

First, Defendants do not support their general contractual argument with any citation to Pennsylvania authority decided in the context at issue here. Neither *Muhammad* nor *Herman* involved insurance policies generally or the operation of the MVFRL. *See* 587 A.2d 1346; 213 A.2d 594. While general contract principles are worthy of consideration in many instances, where a specific legislative scheme in a heavily regulated industry is at issue and state court decisions specific to insurance policies are abundant, Defendants' broad-brush argument is not persuasive.[7]

Importantly, the Superior Court of Pennsylvania has not attached significance to the issuance of a new policy by a new insurer affiliated with the insurer under the expiring

---

[7] Defendants' general contract approach arguably applies more broadly than suggested. First, policy renewals contain language that could be construed to provide an offer, acceptance, and consideration as seen in Selective-South Carolina and Selective-America renewal policies where the insured is instructed that " [i]n return for payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance indicated in the schedule above." (*See, e.g.,* Doc. 19-1 at 25; Doc. 19-2 at 24.) Second, pursuant to Defendants' definitions of relevant terms (*see* Doc. 11 at 18-24), renewal policies are "delivered or issued for delivery in this Commonwealth," 75 Pa. C.S.A. § 1731. To the extent the language in renewal policies satisfies contract requirements and said policies are delivered or issued for delivery, in Defendants' contractual scheme the requirements of §§ 1731 and 1734 would have to be satisfied with each renewal. Yet Defendants do not suggest that each renewal contract issued or delivered to an insured requires the insurer to again offer UM/UIM coverage in amounts equal to the bodily injury liability coverage pursuant to § 1731 unless the insured again elects to limit that coverage in writing pursuant to § 1734.

policy. In *Weilacher*, the insureds' policy of insurance was transferred from State Farm Fire and Casualty Company to State Farm Mutual Automobile Insurance Company in September 1999. 65 A.3d at 985. Nothing in the Superior Court opinion suggests that the transfer was the event which triggered the new insurer's need to provide UIM benefits equal to bodily injury benefits under § 1731 unless the insured sought lower limits in writing under § 1734. Rather, *Weilacher* found the insurer ran afoul of the requirements of §§ 1731 and 1734 which "plainly state that an insurance policy must provide UM/UIM coverage limits that are equal to bodily injury limits unless the insured completes a proper request for reduction of the UM/UIM coverage limits" because the insureds "did not request any reduction of the UM/UIM coverage limits after the UM/UIM coverage was added to their policy." 65 A.3d at 988. Thus, it was the change in policy provisions and not the issuance of a policy by a new affiliated insurer which provided the basis for the court's conclusion that the insureds were entitled to UIM coverage equal to the bodily injury limits of $500,000 in the policy rather than the $25,000/$50,000 UIM coverage indicated in the policy. *Id.*

Here there is no analogous change in policy provisions and, unlike the insureds in *Weilacher*, the insureds in this case completed a valid request for UM/UIM benefits in 2001. The parties do not dispute that when Robyn Novitsky signed the "Commercial Automobile Pennsylvania Coverage Selection Form IMPORTANT NOTICE" on July 30, 2001, a form which identifies "Selective Insurance" at the top of the page, she was apprised of the benefits she must be offered under the policy pursuant to § 1791. (*See, e.g.*, Doc. 19-4 at

2.) Nor do the parties dispute that the "Commercial Automobile Pennsylvania Coverage

Selection Form" indicates she chose $1,000,000 liability insurance coverage, $35,000

uninsured motorist coverage, and $35,000 underinsured motorist coverage. (*Id.* at 3-4.)

Ms. Novitsky signed the form indicating that she fully understood the coverages she had

made and that "[t]hese coverages will remain in effect as outlined above until such time I

execute another Coverage Selection Form." (*Id.* at 5.) These coverage amounts remained

in effect in the July 13, 2011, to July 13, 2012, Selective-South Carolina policy as indicated

in the Coverage Schedule therein (*see, e.g.*, Doc. 19-2 at 161), and are indicated in the

Coverage Schedule of the policy issued by Selective-America for the July 13, 2012, to July

13, 2013, period (*see, e.g.*, Doc. 19-3 at 154). Identical coverages are indicated in the

Coverage Schedule found in the Selective-America policy in place at the time of the

accident, i.e., the policy for the term July 13, 2016, to July 13, 2017. (*See, e.g.*, Doc. 19-1

at 169.)

     Although *Weilacher* did not discuss the affiliation between State Farm Fire and

Casualty Company and State Farm Mutual Automobile Insurance Company, the court

states that the insureds' policy "was transferred" between the two entities. 65 A.3d at 985.

As set out above, the court considered what came before the transfer and what came after it

in terms of changes made to the policies' provisions rather than attaching legal significance

to the issuing entity. 65 A.3d at 985-88. Though Defendants' argument hinges on the fact

that Selective-South Carolina and Selective-America are separate corporations, they do not

33

deny the affiliation between the two. Importantly, they cite no authority to support the proposition that affiliated subsidiaries of a parent company should be distinguished such that a change in insurer should not be deemed a transfer. Further, they cite no authority to support the proposition that a change in the policy provider, rather than a change in the policy provisions, is the event of legal significance.[8]

For these reasons the Court concludes Defendants have not shown that the execution of the 2001 selection form did not remain viable when Selective-America became their insurer. From this it follows that they have not shown as a matter of law that,

> pursuant to 75 Pa. C.S. §§ 1731 and 1734, the amount of underinsured motorist coverage under the 2016-2017 Selective Insurance Company of America policy in effect at the time of the May 24, 2017 crash is $1,000,000 combined single limit based on the failure of Plaintiff . . . to produce a written request for lower underinsured coverage by the named insured, Village Auto Sales, Inc., that pre-dates the May 24, 2017 crash.

(Doc. 9 at 11; Doc. 44 at 10-11.) Therefore, Defendants' motions for summary judgment (Docs. 9, 44) are properly denied.

## B. Plaintiff's Motions

In contrast to Defendants' identification of the issue, Plaintiff states "it is the binding nature of the [July 30, 2001] signed Form, against the backdrop of 24 years of electing and

---

[8] To the extent Defendants distinguish *Breuninger's* discussion of the transfer issue and argue that Plaintiff's reliance on the case is misplaced (*see, e.g.*, Doc. 11 at 26-29; Doc. 26 at 16-22), their arguments will be addressed in conjunction with Plaintiff's motions.

paying for the identical UM/UIM limits, that is at issue." (Doc. 18 at 7.) Specifically, Plaintiff

points to the following language on the Coverage Selection Form signed by Village Auto:

"These coverages will remain as outlined above until such time [sic] I execute another

Coverage Selection Form." (*Id.* (quoting Commercial Automobile Pennsylvania Coverage

Selection Form, Ex. D at 4 [Doc. 12-17; Doc. 19-4 ]).) Plaintiff adds that the terms and

coverage provided by Selective-America remained exactly the same as that provided by

Selective-South Carolina, the policy number remained the same, and the transfer from one

Selective Insurance Group, Inc., subsidiary to another was "seamless and was effectuated

upon the 2012-2013 Selective renewal of Village Auto's expiring Selective-SC policy.

Village Auto did not have to fill out or complete any paperwork to effectuate the transfer.

Rather, the 2012-2013 Selective Policy acted as an annual renewal of Village Auto's

existing insurance." (Doc. 18 at 8 (internal citation omitted).)

Plaintiff maintains that the operative facts and issues in *Breuninger* are "exactly the

same" as those in this case. (Doc. 18 at 12.) Plaintiff contends that Defendants' arguments

to the contrary are incorrect in that *Breuninger* was not decided solely on the provisions of §

1791. (*Id.*)

Defendants distinguish *Breuninger* on the basis that it did not consider the MVFRL

provisions at issue here in the context now presented:

> *Breuninger* did not properly consider the effect of the different language
> contained in § 1731/1734 versus § 1791. Thus, whether the 2012-2013
> Selective-America Policy (and subsequent Selective-America policies including

35

the policy in effect at the time of the May 24, 2017 crash) involved an "application for original coverage" under § 1791 is irrelevant. The determining issue under § 1731 and 1734 is whether the 2012-2013 policy was "delivered or issued for delivery in the Commonwealth . . ." (which it was) and thus required a UM/UIM selection/reduction (which was never obtained).

(Doc. 11 at 28.) Defendants add that *Breuninger* did not render any holding or legal

analysis as it relates to §§ 1731 and 1734, the insured in that case did not make the

appropriate references which Defendant makes here, and *Breuninger* did not interpret the

written Notice issued by Selective-America at issue here. (*Id.* at 29.)

Contrary to Defendants' argument that *Breuninger* did not properly consider the

distinct §§ 1731 and 1734 requirements, Plaintiff asserts that

the *Breuninger* opinion was based on both §§ 1734 and 1791. *See* 675 A.2d at 356-57. In fact, the court found that a § 1734 UM/UIM election made while coverage was provided by Harleysville was sufficient and that Pennland, despite not having obtained a post-transfer election, was entitled to summary judgment enforcing the lower UM/UIM limit. *See id.* "Based on the insured's . . . completion of this coverage selection form, we find that . . . the insured knowingly and voluntarily selected $35,000.00 in UM/UIM coverage under her policy with Harleysville." *Id.* at 357.

(Doc. 18 at 12-13.)

Defendants counter that Plaintiff's argument is incorrect: *Breuninger* discussed §

1734 but did so only with regard to whether Harleysville, the original insurer, complied with §

1734 and when the court analyzed UM/UIM whether the written UM/UIM selection applied

to the subsequent insurer, Pennland, following the policy transfer, it phrased the issue as

the subsequent insurer could "stand in the shoes" of Harleysville for the purpose of meeting

36

the requirements of § 1791. (Doc. 26 at 16-17 (citing *Breuninger*, 675 A.2d at 358).)

Defendants further assert that the

> balance of the Court's opinion as it related to the subsequent insurer addressed
> that issue solely under the notice requirements of § 1791, which requires the
> §1791 notice be given "at the time of application for original coverage." *Id.* at
> 358-60. There was no independent analysis of the effect of the transfer under
> § 1731/1734 which is triggered when an insurance policy is "delivered or issued
> for delivery in this Commoweath." 75 Pa. C.S. § 1731. There was no analysis
> whether the subsequent insurer (Pennland) complied with Section 1731/1734.
>
> Because the insured in *Breuninger* did not raise those arguments, or
> any of the other legal arguments raised here concerning contractual principles
> and/or the separate and distinct legal status of the entities under Pennsylvania
> law, *Breuninger* did not address them and does not control these issues. A
> case is not binding precedent on a point not raised by the parties or discussed
> in the Court's opinion." *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S.
> 33, 38 (1952).

(Doc. 26 at 17.) Defendants further contend that despite Plaintiff's assertion that the

statutes at issue are to be read *in pari materia*, the Superior Court stated in *Emig* that it

would "'not apply a provision in one subchapter to interpret a provision in another

subchapter,'" (Doc. 26 at 19 (quoting *Emig*, 664 A.2d at 566)) and the Pennsylvania

Superior Court decisions "*Weilacher, Larrimore*, and *Emig* make clear that regardless of

whether an insurer complied with § 1791, the insurer must still separately comply with §

1731/1734 and if the insurer does not, the UM/UIM limits will be equal to the liability limits"

(Doc. 26 at 19 (citing Doc. 11 at 23-24).)

The Court agrees with Plaintiff that §§ 1734 and 1791 are to be read *in pari materia*

in that *Emig* specifically stated so. 664 A.2d at 567.

> Statutes or parts of statutes that are *in pari materia*, meaning 'they related to the same person or things or to the same class of persons or things,' are to be construed together, if possible, as one statute. 1 Pa.C.S.A. § 1932. Conflicting provisions must be construed, if possible, to give effect to both provisions. 1 Pa.C.S.A. § 1933.

*Pocono Mountain Sch. Dist. v. Pennsylvania Dep't of Educ.*, 151 A.3d 129, 138 (Pa. 2016); *see also Emig*, 664 A.2d at 566-67. *Emig* provided a detailed analysis of §§ 1734 and 1791 before concluding the sections were *in pari materia* in that, among other things, they "both relate to insureds who are faced with the decision whether to purchase UM/UIM coverages, and, if so, in what amounts." 664 A.2d at 567. *Emig* did not find the provisions in conflict, rather the court concluded that § 1791

> informs insureds that insurers may offer higher or lower benefits than those enumerated in the "Important Notice". It does not require an insured to purchase these coverages. It does not regulate the manner by which application for these coverages is to be made. It operates simply as a notice that (1) certain benefits are available for purchase by an insured and (2) an insured is presumed to know and understand these available coverages, as well as the one(s) which he or she has actually selected. *See* 1 Pa.C.S.A. § 1924, *supra*.
>
> However, in order for the conclusive presumption of Section 1791 to be effective, an insured must have actually selected coverage(s), and the selection process must first be in conformity with the law, *i.e.*, in this case, with Section 1734.

664 A.2d at 568–69. *Emig's* explanation of the interplay between §§ 1734 and 1791 shows that Defendants are correct that an insurer must separately comply with § 1734. However, it also shows that the sections are to be construed together with conflicting provisions read, if possible, to give effect to both. 1 Pa. C.S.A. § 1933.

Acknowledging distinctions in the timing and requirements of §§ 1731, 1734, and 1791, and the announced basis for the transfer-related holding in *Breuninger*, the Court concludes that *Breuninger* is persuasive but not conclusive as to the matters at issue in this case. Therefore, the question is whether *Breuninger* is indicative of how the Pennsylvania Supreme Court would interpret the relevant provisions of the MVFRL in the context presented here. *See Buffetta*, 230 F.3d at 637. For the reasons discussed below, the Court concludes that the Superior Court's *Breuninger* decision points to how the Pennsylvania Supreme Court would interpret whether a § 1734 valid election for reduced UIM benefits would continue to apply when the insurer identified in the policy under which it was executed was replaced by an affiliated insurer. The Court further concludes that the Pennsylvania Supreme Court would conclude that the UIM benefits chosen under the valid election remained in effect upon transfer with the result in this case that the UIM benefits available under the policy in place at the time of the May 2017 accident are \$35,000.

As in this case, in *Breuninger* the lower court had been presented with "an action for declaratory judgment instituted to interpret coverage provided by a policy of automobile insurance." 675 A.2d at 152. The lower court granted summary judgment for the insurer, finding that the insured was entitled to \$35,000 UIM coverage (the amount indicated in the relevant policy) rather than the \$100,000 claimed by the insured (an amount equal to the policy's bodily injury coverage). *Id.* The Superior Court affirmed the lower court's decision, noting that "the only issue to be resolved by the lower court was 'whether the insured

39

knowingly and voluntarily selected $35,000 in UM/UIM coverage as a matter of law.'" 675 A.2d at 356. Thus, the issue presented to the lower court is similar to that presented here in that this Court considers whether the insureds' selection of $35,000 UIM coverage in 2001, the amount of coverage reflected on the policy in place at the time of the accident, is the amount of UIM coverage they are entitled to as a matter of law.

While Defendants focus on distinctions between *Breuninger* and the case at bar, their attempt to undermine the viability of *Breuninger's* § 1734 determination in the current context is not persuasive for several reasons. The Superior Court's ultimate determination that the insureds were not entitled to UIM benefits equal to the bodily injury coverage in the applicable policy logically encompasses a conclusion that the insureds' knowing and voluntary election of $35,000 UIM coverage in 1990 under the Harleysville policy applied to the Pennland policy in place at the time of the accident. To conclude otherwise, would disregard the Superior Court's expertise in analyzing relevant issues of state law.

*Breuninger's* careful consideration of whether the insured had validly executed a § 1734 reduction in benefits shows that the Superior Court analyzed all relevant MVFRL provisions. 675 A.2d at 356-57. This analysis preceded the court's § 1791 analysis, and the opinion provides no basis to conclude that *Breuninger* did not rely on its § 1734 determination in reaching its ultimate conclusion that the insured was entitled to the $35,000 UIM coverage indicated in the policy. This is particularly so given the Superior Court's July 1995 *Emig* opinion where the Superior Court analyzed the relationship between the

40

conclusive presumption of § 1791 and UM/UIM coverage reductions under § 1734 and concluded that compliance with the former does not indicate a valid selection under the latter. 664 A.2d at 569. Because a valid § 1734 reduction in benefits requires that the insured "have actually selected coverages . . . in conformity with the law," *id., Breuninger* would not likely have failed to address the issue if the transfer of the policy to Pennland invalidated the insured's 1990 § 1734 election.

Further, the Court cannot distinguish *Breuninger* based on underlying facts. In both cases the insured executed a valid § 1734 waiver prior to the unilateral policy change. Pennland was a wholly owned subsidiary of Harleysville, *id.* at 358, and here Selective-South Carolina and Selective-America are both identified in the policies as "Selective Insurance Companies" (*see, e.g.,* Doc. 19-1 at 13; Doc. 19-2 at 12; Doc. 19-3 at 18) and the insureds were provided with a "NOTICE OF POLICY TRANSFER INTO NEW SELECTIVE AFFILIATE" where Selective-South Carolina was identified as the old affiliate and Selective-America as the new affiliate (*see, e.g,* Doc. 19-3 at 3-4; see also (Doc. 10 ¶ 47; Doc. 20 ¶ 47) The policy number, coverage, and premium remained the same following the transfer here (Doc. 19-3) and in *Breuninger,* 675 A.2d at 358. *Breuninger* noted that the only relevant difference between the insured's policy with Harleysville and the policy with Pennland was the name of the insurer, 675 A/2d at 358; here the only difference between the insureds' policy with Selective-South Carolina and Selective-Ameica is the name of the insurer. The record in *Breuninger* revealed that the insured never objected to

41

the transfer of her policy and made premium payments to Pennland, 675 A.2d at 358; here the record shows the insureds did not object to the policy transfer and continued to make the required payments.

The Court has considered all the evidence in the light most favorable to the insured and interpreted the policies and statutory provisions at issue mindful of the obligation to "interpret the intent of the legislature and the language of the insurance policies to favor coverage for the insured." *Emig*, 664 A.2d at 566. However, with no basis to factually distinguish *Breuninger* and the determination set out above that *Brueninger's* failure to discuss § 1734 in its transfer analysis is not a genuine distinction, the Court concludes the Pennsylvania Supreme Court would decide the precise § 1734 issue presented here in a manner consistent with *Breuninger*, i.e., that the transfer of the policy did not create a new relationship which invalidated previously executed statutorily mandated documents, including the insureds' 2001 § 1734 election. Reading the provisions *in pari materia* as directed in *Emig*, because both §§ 1734 and 1791 "relate to insureds who are faced with the decision whether to purchase UM/UIM coverages, and, if so, in what amounts," 664 A.2d at 567, it is logical to conclude that, when there is no policy change other than the name of the insurer who is an affiliated entity, a new § 1734 election would not be required where no § 1791 notice is required. The Court's conclusion is consistent with and supported by *Weilacher's* finding that the event of legal significance related to §§ 1731 and 1734 was the change in policy coverage rather than the change in the named insurer. 65 A.3d at 986-88.

42

It is also consistent with the Superior Court's general pronouncement in *Snyder v. Liberty Mutual Insurance Company*, No. 2764 EDA 2012, 2013 WL 11257220 (Pa. Super. Ct. July 31, 2013) (Not Precedential), that "[i]n *Breuninger,* this Court held that the transfer of a motor vehicle policy from one company to another does not constitute a 'new' policy." 2013 WL 11257220, at *4.[9]

Accordingly, the Court finds that the insureds' 2001 election of $35,000 in UIM coverage remained a valid election following the transfer of coverage to Selective-America and effectively limited UIM coverage to $35,000 in the policy in place in May 2017 when the fatal accident occurred. The Court further finds that Plaintiff's cross-motions for summary judgment (Docs. 17, 47) are properly granted.

## V. CONCLUSION

For the reasons discussed above, Defendants' motions for summary judgment (Docs. 9, 44) will be denied and Plaintiff's cross-motions for summary judgment will be

---

[9] Despite Defendants' argument that *Snyder* should not be considered (Doc. 26 at 20-21) and their correct assertion that *Snyder* was decided in the context of a limited tort election under a different statutory provision (*id.* at 21), this Court is free to consider the decision as a non-precedential Superior Court opinion decided in a different context than that presented here. In so doing, the Court finds *Snyder* indicative of *Breuninger's* applicability beyond the strict confines of the facts considered therein and further finds that *Snyder's* citation to the 1996 *Breuninger* decision underscores the continuing viability of *Breuninger* despite Defendants' assertion that *Weilacher* and *Larrimore* (both decided before *Snyder*) made distinctions between § 1791 and §§ 17931/1734 which undermine *Breuninger's* broader application (*see, e.g.,* Doc. 11 at 28).

granted. Judgment is to be entered in favor of Plaintiff and the case is to be closed. An

appropriate Order is filed simultaneously with this Memorandum.

Robert D. Mariani
United States District Judge

Dated: 3/1/19